2013 Ark. App. 229

**Kerry WARREN, Appellant**

v.

**Theresa Warren TREAT, Appellee.**

**No. CA 12–671.**

Court of Appeals of Arkansas.

April 10, 2013.

Worsham Law Firm, P.A., Little Rock, by: Richard Worsham, for appellant.

Schieffler Law Firm, West Helena, by: Edward H. Schieffler, for appellee.

RITA W. GRUBER, Judge.

Kerry Warren appeals an order of the Phillips County Circuit Court partitioning certain farmlands and a home place in Phillips County, Arkansas. The order addressed his petition to partition and his sister Theresa Warren Treat's counter-petition to partition. He contends that the court erred in awarding Treat the Warren house, sheds/shops, and other improvements. We affirm.

Ruby C. Warren was the widow of Claude Warren, who died in 1986. Ruby died in May 1994, leaving a last will and testament that appointed Kerry as executor. The will divided Ruby's land among her nine surviving children, with six each receiving approximately 52.88 acres of farm land, and the other three—Kerry, Theresa, and their sister Carolyn Warren—receiving three parcels to hold as tenants in common. At issue in the present case is the bequest of two parcels:

I give, devise and bequeath to my daughters, Theresa Kay Warren and Carolyn Warren, and my son Kerry Lynn Warren, or to the survivor or survivors amongst them living at the time of my death, in fee simple, the following lands in Phillips County, Arkansas:

1. The West Half (W½) of the Northeast Quarter of Section Twenty–One (21), Township Four (4) South, Range One (1) East of the Fifth Principal Meridian, Less and Except, that part thereof conveyed by Deed recorded in Book 440, Page 601 of the Phillips County Records, and being all that part of this land lying West of the Center line of Lambrook Levee Borrow Pit Ditch.

2. 5.6 Acres in the Southeast Corner of the Southwest Quarter (SW ¼) of the Southeast Quarter (SE ¼) of Section Fourteen 14, Township Four South,

Range One East of the Fifth Principal Meridian, described as follows:

. . . .

Theresa, Kerry, and Carolyn all survived Ruby.

Two handwritten letters by Ruby were discovered after her death. Each reflected her wish for the house to go to Theresa, who had lived with Ruby at times after Claude's death and after Ruby suffered a heart attack. Ruby wrote in the letter dated June 15, 1993, "[I]n case I die before this is recorded I want Theresa to have my house if she want it. If she don't want it she can decide Kerry or Carolyn. It is not to be sold outside the family. I love you all and may God Bless you." In an undated letter "To the Family after I leave this world," she wrote, "[I]f something happen before I get this part recorded I wish for Theresa to have the house if she want it. If not she can let one of the other who need it most, but please keep it in the family." By October 2011, Theresa and her husband had spent over $62,000 on the house.

Kerry had begun leasing and farming the land upon his father's retirement, and he farmed Ruby's land until 2008 when a dispute arose among the siblings. In February 2008, he contacted the Phillips County Farm Services Agency about reconstituting the Ruby |₃Warren farmland, identified until that time as FSA 2277. A notice of farm reconstitution, effective on July 14, 2008, reconstituted FSA 2277 into separate farm numbers that reflected the siblings' individual ownership.

Kerry, Theresa, and Carolyn commissioned a survey in September 2008 that divided their largest parcel, containing approximately 161.9 acres, into three tracts: Tract I contained approximately 50.24 acres, Tract II had approximately 55.83 acres, and Tract III had approximately 55.83 acres; located on 2.07 acres in the northwest corner of Tract III were the family home and several structures. After the survey was prepared, Kerry and Theresa executed a warranty deed to Carolyn for their undivided interest in Tract I and for the 5.6–acre tract described in Ruby's will. This deed was recorded with the circuit clerk in January 2009.

A dispute arose about dividing the remaining property held by Theresa and Kerry as tenants in common. Carolyn executed a deed in June 2009 conveying her interest in Tract III to Theresa, but Kerry did not join in executing the deed and conveying his interest. Carolyn executed a quitclaim deed in August 2011 divesting herself of her interest in Tract II, and the deed was recorded in September 2011. Theresa never received a deed to Tract III from Kerry, and Kerry never received a deed to Tract II from Theresa. In December 2008, Kerry wrote Theresa asking that she lease him her 56.5 acres; he referred to the acreage as FSA No. 3805, the number that had been assigned to it in the July 2008 reconstitution. Kerry enclosed in his written proposal two optional agreements: one specifying that he would pay cash to rent, and another specifying that he would pay twenty-five percent of the crops. |₄Theresa did not agree to the lease, and her son farmed the land in 2009.

In July 2009, Kerry filed his petition for partition. He alleged that he and Theresa had an undivided interest in the disputed property and that he owned a portion of it by virtue of payment he had made "to the other heirs of Ruby C. Warren." He asserted that he and cotenant Theresa were in conflict over an appropriate division of the properly, that the property was capable of division in kind, and that the court should order the properly to be divided and apportioned according to commissioners appointed by the court. Theresa filed

a response and a counter-petition for partition alleging that the parties had reached an agreement for division of the property and praying that the court divide the land pursuant to the agreed-upon 2008 survey.

It was undisputed at three hearings before the circuit court—held in December 2009, December 2010, and October 2011—that the family home was located on Tract III and that Theresa had possession of the home; that also located on Tract III were a pole barn, a metal shed, and a chemical shed Kerry had used for farming; and that these sheds/shops were located on 2.07 acres in the northwest corner of Tract III. In its order of January 25, 2012, the circuit court decided ownership of the three tracts and the home place without appointing commissioners as requested by Kerry.

The court found that execution of deeds was not necessary and that the parties had agreed that Carolyn should receive Tract I, Kerry should receive Tract II, and Theresa should receive Tract III. The court further found:

> Theresa Warren Treet[1] owns the West 1/3 of the Ruby Warren home place, as set forth in the survey, and Kerry Warren owns the middle 1/3 of the home place, as set forth in the survey. A copy of the survey is attached hereto and made a part hereof as though completely set forth in this order. As owner of the West 1/3 acreage, Theresa Warren Treet owns the Ruby Warren home house. Kerry Warren did not purchase the sheds/shops located on Theresa Warren Treet's West 1/3 acreage. The sheds/shops are fixtures and are owned by Theresa Warren Treet, as owner of the land upon which they sit. The fish pond dock was erected before Ruby

Warren died. The dock is owned by Theresa Warren Treet, as owner of the land upon which it sits.

On appeal, Kerry challenges these and other findings of the circuit court. He contends that he paid for the sheds/shops and land; that he was entitled to the buildings and underlying land; and that the alleged oral agreement to partition, rather than creating a new estate for each party, was merely an agreement to possession.

We review findings made in a bench trial to determine whether they are clearly erroneous or clearly against the preponderance of the evidence. Ark. R. Civ. P. 52(a); *Feagin v. Jackson*, 2012 Ark. App. 306, 419 S.W.3d 29. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake was made after review of all the evidence. *Id.* Facts in dispute and credibility determinations are within the province of the fact-finder. *Id.*

### Whether Kerry Paid For the Sheds/Shops and Land

There was conflicting testimony on Kerry's claim that he purchased the 2.07 acres and sheds/shops from the other heirs. On appeal, he points to testimony by himself, his wife, and his sisters Ann Caldwell and Carolyn that he did so. This viewpoint, however, was specifically disputed by the testimony of Theresa and their brother Don Warren.

Kerry testified that he decided on an executor's fee of $25,000 after consulting with a CPA, that he paid Don $3,000 and Theresa $6,000 for helping him, and that he planned to keep $16,000. He testified

1. We reproduce the spelling of this surname as it appears in the circuit court's order contained in the record lodged in this appeal.

that other siblings "threw a fit" about the fees and also demanded about $13,000 for the shops. Kerry, Don, and Theresa all testified that together they paid back $13,000 in executor's fees: $7,000 from Kerry, $2,000 from Don, and $4,000 from Theresa. Don and Theresa testified that the amount was to be divided among all nine siblings at $1,444.44 each.

Theresa testified that Kerry did not pay for the sheds/shops—that he just gave back executor money. Don testified that Kerry never paid anyone for the sheds/shops, that his siblings never received a check for the sheds/shops, and that the $1,444.44 Kerry distributed to each sibling was for paying back $13,000 worth of executor's fees to the estate. Lisa Warren, Kerry's wife and the bookkeeper for Kerry Warren Farms, testified that each sibling received $1,444.44 for the sheds/shops, with five siblings getting checks in that exact amount but others getting less because debts they owed Kerry were deducted. Lisa also testified that in 1991 she and Kerry began paying insurance on the shops, which Ruby had told him would be his at her death. Lisa acknowledged there was no deed showing that the sheds/shops belonged to Kerry.

The circuit court found evidence of only one $1,444.44 payment to each sibling, and on that basis rejected Kerry's assertion that he repaid excessive executor's fees by paying each sibling $1,444.44 and also paid each of them $1,444.44 for the sheds/shops. The court noted that the sheds/shops were located on the land devised to Kerry, Theresa, and Carolyn; belonged to them after the estate was closed; and were never owned by the other six siblings. The court observed that Kerry admitted his testimony was "confusing" about paying his siblings for purchase of the sheds/shops as well as for repayment of executor's fees. The court found that payment for the sheds/shops should have been made only to Theresa and Carolyn, and that the other six would have received nothing. The court concluded that Kerry did not pay for the sheds/shops and that, instead, the money he paid to the heirs was reimbursement of executor's fees that had been paid previously. These findings were dependent on determinations of conflicting evidence and the credibility of witnesses' testimony, which are matters for the trial court rather than the appellate court. We find no clear error.

### Whether Kerry Was Entitled to the Sheds/Shops and Land in the Partition

Kerry argues that the circuit court should have required the cotenants to reimburse him for the "thousands of dollars" he spent maintaining and making improvements to the sheds/shops, or should have awarded him possession of the buildings and underlying property. He points to his testimony about expenses he incurred in pouring concrete, painting, installing doors, and maintaining the buildings. He recites that in a proceeding to partition land between cotenants, a tenant in common who made improvements will be indemnified "either by having the part upon which the improvements are located allotted to him or by having compensation for them, if thrown into the common mass." *Graham v. Inlow*, 302 Ark. 414, 417, 790 S.W.2d 428, 430 (1990).

Kerry testified that he farmed FSA No. 2277 while his mother was living and until 2008. He said that he "took all the rent money from the whole farm" and paid taxes, insurance, and expenses, which he deducted. He stated:

> We divided it nine ways all except the shop and we paid insurance on the shop, we didn't deduct it.... I did deduct the expenses of the real estate taxes and

other expenses, insurance for the farm from the crop proceeds. All the family paid. Then everybody got a one-ninth interest after that.

Kerry's wife, Lisa, testified in 2010 that they regularly painted and did other maintenance; that seventeen or eighteen years earlier, Kerry had paid someone to pour the shop's concrete floor—which she called a business expense; and that Theresa had paid nothing of the $8,000 or $9,000 for the concrete.

Don Warren testified that he was one of Kerry's landlords for lease of the Ruby Warren Estate farm from 1994 to 2008. Don stated:

When you rent a piece of land, you, the shop goes with the land, and you maintain it.... Kerry Warren did not make any deduction from the crop rent that I, as landlord, received after my mother's death through 2008 that I'm aware of. We got a net rent from my understanding. On painting the buildings; is that what you're saying? As far as I know he maintained the buildings out of the rent from the farm. The insurance was paid, and the property tax was paid, and it all come out of the rent off the crops, our share.

I've been a farmer for forty years. I have leased ground before. I have leased ground with improvements on it. It was my responsibility to maintain the improvements that the lease existed. That is customary for other farmers that are tenants.

Kerry's petition for partition did not seek reimbursement for monies spent on improvements as a cotenant; he did not request specific findings on this issue; and on appeal, he points to no evidence that he made improvements to the land in his role as cotenant rather than as a tenant of the land he leased. We cannot say that the circuit court clearly erred in failing to or-der reimbursement or possession of the sheds/shops and underlying property on the basis of improvements.

*Whether the Circuit Erred in Enforcing the Alleged Oral Agreement to Partition*

Kerry notes that after the survey was prepared for the heirs to the old home place, only one deed was executed—the deed from Kerry and Theresa to Carolyn for the east 1/3. He argues that because neither he nor Theresa received compensation, the deed transferred possession only, and that there remains the question of who possesses the other thirds. He argues that for years, he possessed the 2.07 acres where the sheds/shops are located; that he, rather than Theresa, maintained the shops and made improvements; and that he did not have to execute a lease for use of the sheds/shops. He asserts that Theresa might have possession of the house by agreement but does not own the west 1/3 of the home place, the sheds/shops, and improvement on the west 1/3.

Theresa notes in appellee's brief that the deed from Kerry and herself—conveying the east 1/3 of the home place to Carolyn—expressed their desire as tenants in common "to divide their land so that each will own their land individually" and referred to "the further consideration of the division of the lands owned as Tenants in Common by simultaneous Deeds." She notes that the parties received separate registration numbers for their particular tracts of land. She disputes Kerry's claim to the land under the sheds/shops, pointing out that he did not "include the 2.07 acres of the farm shop in his FSA registration, on the proposed 2009 lease nor the 2008 survey," and that no deed reflected an offset for the acreage. She points to testimony by Don and herself that she and her husband sold their existing home and

moved into the old home place; that she received less farmland in her 1/3, which included "ratty ground" and unusable fish ponds; that Kerry received the big well for irrigation and a center pivot in the middle; and that Carolyn received the five-acre tract on the highway. She concludes that the parties "owned their land with actions, money invested, and agreement." She asserts that the law favors family agreements and should do so here.

Kerry relies upon *Hutchison v. Sheppard,* 225 Ark. 14, 279 S.W.2d 33 (1955), in which an oral agreement to partition did not create a new estate for each party but was merely an agreement as to possession. *Sheppard,* however, involved two life tenants in common who held under a deed granting remainder to heirs of their bodies. The voluntary partition in that case was only an agreement of possession for the life of the life tenants, who could not convert what they did not have—control of the possible reversion interest. The case now before us does not involve life tenants in common.

A voluntary partition or division of lands by cotenants may be established by any competent evidence. *Seawell v. Young,* 77 Ark. 309, 91 S.W. 544 (1905). The trial court in *Seawell* found that Mrs. A.E. Seawell and L.L. Seawell, her son, made a division of a ten-acre tract they held in common; that they had an understanding that she should get the east half (the acres in controversy) and he should get the west half; and that their understanding was consummated by his taking possession of the west half and her retaining possession of the east half. Further,

> [s]uch being the understanding, and effect having been given to it by the reciprocal giving and taking of possession, L.L. Seawell was in equity bound by it, although he had not executed a deed evidencing the transfer of title. She

performed her part of the agreement, not only by surrendering possession to the west half, but by executing a deed therefor, and she confined her possession and claim thereafter to the east half.

*Seawell,* 77 Ark. at 316, 91 S.W. at 546 (citations omitted).

In *Casteel v. Casteel,* 205 Ark. 837, 837, 170 S.W.2d 1004, 1006 (1943), our supreme court wrote:

> [W]here a portion of a tract of land held in co-tenancy is conveyed to one of the cotenants, or to a third person at his request and for his benefit, and the value of such tract so conveyed is not, at the time of such conveyance, unreasonably disproportionate to the value of the undivided interest which such cotenant held in the entire tract just prior to such conveyance, a presumption arises that such conveyance was made in conformity to an agreement reached between the cotenants for the division and partition of the entire tract, and that the lands described in such conveyance constitute the lands allotted to such cotenant as his full interest in the entire tract, and the burden rests upon one claiming that such agreement of partition was not made, or if made that it did not cover or affect the entire tract, to establish such facts by a preponderance of the testimony.

In the present case, the circuit court found that Theresa had established the legal right to receive the west 1/3 of the home place (Tract III) as her sole, separate, and exclusive property, which would dictate that Kerry would receive the middle 1/3 (Tract II). The court noted that in September 2008, the three tenants in common had the home place surveyed and divided into three tracts of somewhat equal acreage; that the survey indicated Tract I would belong to Carolyn, Tract II

to Kerry, and Tract III to Theresa; and that Kerry at least acquiesced in the survey and then relied upon it when he introduced it into evidence. The court further found:

> [Kerry] never objected to Tract III being designated as belonging to Theresa. It was always agreed that Carolyn would receive Tract I, Kerry would receive Tract II, and Theresa would receive Tract III. As a result, Kerry and Theresa conveyed their undivided interest in Tract I to Carolyn by Warranty Deed which was signed on December 14, 2008, and recorded on January 26, 2009. In 2008, Kerry sent to the ASCS office and had the entire Ruby Warren farm land (FS 2277) reconstituted so that those who wanted their separate acreage removed from FS 2277 could have their own FSA number. Through the efforts of Kerry and the ASCS office, Theresa was given FSA 3805 for her 56.5–acre parcel and Kerry was given FSA 3807 for his 56.5–acre parcel. Defendant's exhibit No. 10–A indicates that the USDA, Farm Service Agency, designed the West 1/3 of the Ruby Warren home place as FSA 3805 (Theresa's farm number). The Farm Service Agency also designated the middle 1/3 as FSA 3807 (Kerry's farm number). The survey of the 2.07–acre parcel indicates that the east line of the 2.07–acre parcel adjoins Theresa's acreage. Lastly, Kerry wrote to Theresa on December 1, 2008, to attempt to rent her FSA Number 3805 acreage.

We cannot say that the circuit court clearly erred in finding that the tenants in common agreed upon a division of the property at issue and did not merely agree as to possession. Thus, the court properly awarded Theresa her 1/3 interest in the home place, shown on the survey as Tract III.

Affirmed.

VAUGHT and HIXSON, JJ., agree.